# Fields et al. v. Lewis et al.

(Decided Dec. 9, 1938.)

A. D. HALL and ROY W. HOUSE for appellants.

WILLIAM LEWIS & SON and MURRAY L. BROWN for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Affirming.

Thad Lewis, a citizen and resident of Laurel County, Kentucky, died in October, 1933. He was then 83 years of age, having been born and reared in Clay County, Kentucky, from whence he moved to Laurel County in January, 1932. He was married twice. There were two children by the first marriage—the appellant and plaintiff below, Katie Fields, and the appellee and one of the defendants below, Elhanan Lewis, whose wife is the appellee and defendant below, Sallie Lewis. Some 21 years before the death of Thad Lewis his first wife died, and in about a year thereafter he married the appellee and defendant below, Nancy Lewis, who was about 19 years his junior—she being 69 years of age at the time she gave her deposition in this case. No children were born of that union. The appellee and defendant below, Felix Lewis, is a grandson of Thad Lewis—he being the son of the defendant, Elhanan Lewis—while the appellee and defendant below, Margaret Lewis, is the wife of Felix Lewis.

In April, 1932, about three months after Thad Lewis acquired and moved to the tract of land in Laurel county, he executed a deed, crudely drawn, whereby he conveyed it in remainder—after reserving a life estate to himself—to his grandson, Felix Lewis, subject to a

life estate in remainder to one-half of it to his wife, if she survived him. It was provided in the deed that Felix Lewis would immediately construct a residence for himself and family on a portion of the tract and occupy it, with the right to cultivate portions of it in consideration of which he was to look after and manage the other portions of the farm not cultivated by him for and on behalf of Thad Lewis, his grandfather. He complied with the obligation so imposed upon him by constructing the new residence with the necessary outbuildings, which he and his family occupied continuously thereafter up to the death of Thad Lewis and since then. He likewise discharged his obligations with reference to managing and looking after the cultivation of the farm and the marketing of its produce for the years 1932 and 1933 preceding his grandfather's death. The widow, Nancy Lewis, of course, continued to occupy the older residence on the Laurel county farm following the death of her husband.

In that situation an "in-law" of Thad Lewis (the appellant and plaintiff below, P. H. Fields) and his wife filed this equity action in the Laurel circuit court against Felix Lewis and wife, Elhanan Lewis, and his wife, Nancy Lewis, the widow of the decedent, by which they sought to cancel the deed executed to Felix Lewis conditioned as stated. In their petition they charged that Thad Lewis was mentally incapacitated to execute the attacked instrument at the time he attempted to do so, and that the defendants had conspired among themselves to fraudulently, coercively, unlawfully and corruptly induce him to do so, and by which he was unduly influenced to execute it, and but for which he would not have done so. Defensive pleadings denying the averments of the petition were filed by defendants, and upon submission, after taking more than 350 pages of depositions, the court dismissed the petition—to reverse which plaintiffs prosecute this appeal.

The sole question in the case is—whether or not the trial judge improperly appraised the testimony by which he concluded that the averments of the petition were not sustained, resulting in its dismissal. In determining that question the rule by which this court is guided in reviewing fact-findings of the chancellor should not be lost sight of. It is, that this court on appeal will review the testimony for itself, and if there is substantial preponderance of the testimony against the findings of the

facts by the chancellor his conclusions thereon will be reversed; but if the testimony creates no more than a doubt in the mind of this court, then his findings will be affirmed. That rule is so thoroughly established as to require neither time nor space in substantiating it with a listing of former opinions. We take this from the judgment of the court expressing his appraisement of the testimony relating to the facts:

"The Court is of the opinion and finds that the weight of the evidence in this case shows that Thad Lewis at the time of the execution of the deed complained of, although an old man, was of sound mind and fully capable of attending to and transacting his own business at all times, and he was especially of sound mind and fully capable of transacting his own business at the time of the execution and delivery of the deed sought to be cancelled. In fact, the Court finds that many of the witnesses whose depositions were taken for the plaintiff herein and who were close relatives of the said Thad Lewis, and who had known him all their lives, admit that they saw nothing wrong with the mental condition of Thad Lewis. It is true that he was an old man at the time of the execution of this deed but was rather active physically up until a very short time before his death." We unreservedly approve that summation of the court.

Nearly all of the witnesses who testified for plaintiffs were their relatives, some of whom were members of the Fields family, but the most active one was the son-in-law, the appellant and plaintiff below, P. H. Fields, who strained himself and told all he could for his side of the case, but whose testimony, when weighed in the scales to test its probative force, is found to be almost entirely wanting, as some few illustrations will demonstrate. He was asked and answered:

"From your association with Thad Lewis for forty years or thereabouts as you have mentioned and your acquaintance with him at or about April 1932, tell the Court whether he at that date or about that date had sufficient mind to know the extent of his estate, A. Don't think so.

"Q. Tell the Court from that knowledge whether at that time or about that time he had sufficient mind to realize or know what disposition he really wanted to make of his property? A. Don't think so.

"Q. Knowing Thad Lewis as you knew him during the time that you have spoken of, if he made the deed which it is purported he made to the defendant, Felix Lewis, were the making of said deed were really the acts of the said Thad Lewis or the defendant, Felix Lewis. A. Felix and Nancy's I think.

"Q. After Thad Lewis and his grandson, Felix Lewis, seemed to take up together, is it a fact that you always saw the two together wherever you saw one the other was there? A. I think so, I don't think I ever saw him but what Felix was with him.

"Q. And during the time beginning with the time you say that Felix and Thad Lewis became chummy with each other did you ever know him from that time until his death to do anything against the will of Felix Lewis? A. No sir."

The questions were objected to but overruled with exceptions. They were very suggestive, even if the competency of the witness (husband of his wife) should be admitted. He was but a nominal party, since he had no interest in the subject matter of the legal controversy except potential courtesy in whatever portion of the land his wife would inherit from her father if the. deed in controversy should be cancelled. Moreover, the questions were extremely suggestive and the answers were far from positive and were based upon no concrete facts justifying them. The witness, as well as others, did testify, however, that for sometime before the death of Thad Lewis he would meet acquaintances—and sometimes members of his family—and would not recognize them at once; but each witness who so testified in the case stated that the old man's eye-sight began to fail him for some time prior to his death, and it was after he became so afflicted that he was unable to recognize the witnesses by sight when first meeting them. No concrete instance is given indicating in the slightest degree any impairment of mentality, other than the fact of physical decline. Some of the witnesses testified to instances of failing memory, and one witness told about being at a funeral which was attended by Thad Lewis, and in a conversation between the two witness said: "It appeared to me in that conversation that he was a little bit off." However, what produced that "little bit off" conclusion on the part of the witness was not stated by him, since he proceeded to tell that the deceased told

him of the transaction herein sought to be set aside and his reasons therefor.

Practically all of the testimony bearing on undue influence was given by the son-in-law, P. H. Fields, who stated that decedent's widow "wore the breeches," and that "whatever she wanted went, and what she didn't want didn't go." The conclusion sought to be drawn therefrom was that decedent's widow unduly influenced him to execute the writing sought to be cancelled, notwithstanding it gave to her but little, if any, more than she would have been entitled to under the law as surviving widow. If she possessed such superinfluence over her husband it would seem strange that she did not exercise it more beneficially to herself by inducing him to convey the entire farm to her instead of to her step-grandchild. Numerous are the trifling and nonprobative instances testified to by witnesses for plaintiffs, which were nothing more than the common occurrences of life, and especially so as relating to persons of more or less advanced age; but none of which tend to establish depreciated mentality sufficient to destroy ability to make contracts or to know the effects thereof.

After all, plaintiffs rest their case almost exclusively upon these two facts—that Thad Lewis was 82 years of age when he made the attacked conveyance, and that for some year or two prior thereto his eye-sight failed him to a more or less extent, whereby he was unable to recognize his acquaintances when first meeting them. In dealing with a similar question in the case of Chrisman v. Quick, 174 Ky. 845, 193 S. W. 13, we said [page 14]: "Equity looks only to the competency of the understanding, and neither age, sickness, extreme distress, nor debility of the body will affect the capacity to make a contract or conveyance, if sufficient intelligence remains to understand the transaction." Also to the same effect is our opinion in the case of Grigsby v. Smith, 174 Ky. 819, 192 S. W. 856. In the case of Swift Coal & Timber Company v. Shepherd, 199 Ky. 54, 250 S. W. 492, we held that it was not enough to defeat a contract for the sale of land on the ground of mental incapacity "to show that the vendor's powers were impaired by age or disease, but it must appear that his mental infirmity was such as to render him incapable of understanding the transaction and protecting his interests in consummating it." Numerous other cases of like tenor will be found listed under the heading "Mental Capac-

ity" in volume 5 of Caldwell's Kentucky Judicial Dictionary, beginning on page 1800.

Substantiating such holdings with historical illustrations, we take from our opinion in the case of Gambill's Adm'r v. Gambill, a will contest case, 236 Ky. 491, 33 S. W. (2d) 325, this excerpt [page 326]:

"They urge that he was old, which is true, but age alone does not imply incapacity. Galileo, the astronomer, Bancroft, the historian, Goethe, the poet, Lamark, the naturalist, Verdi, the musical composer, and Spencer, the philosopher, produced their masterpieces when in their later seventies and early eighties. Titian painted one of his greatest pictures when he was ninety-eight; Hindenburg, the warrior and statesman, is now president of the German empire at eighty-three; Clemenceau was writing his memoirs when he was eighty-six; Justice Holmes is giving active and distinguished service on this nation's Supreme Court at ninety; and Thomas A. Edison, now past eighty-three, is producing original scientific work."

A more extensive analysis of the testimony offered by plaintiffs would more clearly demonstrate the correctness of the chancellor's finding that neither the charged mental incapacity nor undue influence was proven so as to authorize a cancellation of the attacked deed.

But that conclusion is strengthened when we turn to the testimony of defendants, supplemented by statements of some of the witnesses introduced by plaintiffs. That testimony—which was uncontradicted—was to the effect that Thad Lewis, though uneducated, possessed strong mentality and a determined disposition; that he punctiliously looked after his affairs up to within a few weeks before his death, when he became bedridden with the disease that finally produced his death; that up to that time he labored in the fields; traveled about over the country on horseback; looked after litigation pending in his county seat where he was endeavoring to collect notes due him, and numerous acquaintances who saw him during such time gave it as their opinion that he was as mentally sound as he had ever been. He, himself, suggested the making of the conveyance complained of, and went to a neighboring deputy county court clerk to have the deed prepared, which was done by that officer in accordance with his (Lewis') directions. It was

read over to him and he expressed satisfaction with it. His cautious disposition, however, induced him to travel a considerable distance from his home to his county seat in London, Kentucky, in order to submit the document to an attorney, which he did, and obtained the advice that it accomplished the purpose intended by its execution. With that satisfied assurance he went to the courthouse and had the deed recorded and there is nothing in the testimony showing that Felix Lewis took any part, or had anything to do with any of the steps taken by his grandfather relative to the transaction up to that time. Two physician witnesses who had treated him for his ailments testified that his mind was sound up to within a few days before his death, and no professional witness testified to the contrary.

The record in this case, like many other appeals of like nature, creates the inescapable impression that the litigation would never have found its way into the courthouse but for the grasping disposition of some "in-laws," who are motivated by an inclination to acquire for themselves, rather than to see justice done, and who are forced to employ the tools of "failing memory" and "physical depreciation" in the construction of their air castles.

The entire testimony in this case convinces us, as it did the trial judge, that Thad Lewis at the time he executed the attacked deed did so with a settled purpose in his mind to provide for a probable contingency whereby he and his wife, might receive the necessary care and attention in the event they became too feeble to take care of themselves, and that he selected the one of his kinsmen whom he was confident would carry out that arrangement. He told a number of witnesses as much, and they testified that in doing so he appeared to be as rational as he ever was, and fully appreciated what he had done. He had long since given to his other two children land representing in value what he deemed to be their portion of his estate—one of whom, of course, was the plaintiff Mrs. Fields—and the other one the defendant Elhanan Lewis. With the testimony in that condition neither the trial court, nor this one on review, could reach any other conclusion than that the action was and is groundless.

But if the testimony was more favorable to plaintiff than it is—even sufficiently so as to produce a doubt in

772

our minds as to the correctness of the findings of the court—we would then not be authorized to reverse the judgment under the rule supra, since our conclusions upon the facts must do more than create a mere doubt in our minds to authorize a disturbance of the chancellor's appraisement of the effect of the testimony.

Wherefore, the judgment is affirmed.